**Wytheville.**

McBride v. Commonwealth.

June 9, 1898.

Absent, Cardwell, J.

1. EVIDENCE—*Relevancy—Statements in Absence of Accused.*—On a trial for murder, the statements of the deceased made on the day before the homicide, to a third person in the absence of the prisoner, as to where deceased was then going, are irrelevant and should not be received.

2. EVIDENCE—*Order of Introduction—Discretion of Trial Courts—Case at Bar.*—Trial courts are necessarily clothed with a large discretion as to the order in which evidence is to be admitted, and this is especially true where the evidence is circumstantial. Evidence may be admitted which only becomes relevant by the introduction of other evidence at a later stage of the trial, but where this is done, the jury should be cautioned that it is not to be considered unless testimony is introduced connecting it with the subject under investigation, and if such testimony is not introduced that which was admitted under the expectation of its introduction should be excluded. In the case at bar the connecting evidence was not produced, and that which was admitted in expectation of thereafter showing its relevancy should have been rejected.

3. EVIDENCE—*Examination of Witness—Volunteer Statements by Witness.*—After a witness has answered a question propounded to him by a prisoner's counsel, he should not be permitted, under the pretext of making an unnecessary and uncalled for explanation, to introduce irrelevant and injurious testimony against the prisoner.

4. CRIMINAL LAW—*Presumption of Innocence—Case at Bar—*A prisoner is presumed to be innocent until his guilt is established, and he is not to be prejudiced by the inability of the Commonwealth to point out any other criminal agent, nor is he called upon to vindicate his own innocence by naming the guilty man. He rests secure in the presumption of innocence until proof is adduced which establishes his guilt beyond a reasonable doubt, and whether the proof be direct or circumstantial it must be such as excludes any rational hypothesis of the innocence of the prisoner. It is error to instruct a jury, as

was done in the case at bar, that the failure of the evidence to dis-
close any other criminal agent than the prisoner is a circumstance
which may be considered by them in determining whether or not he
was guilty of the crime wherewith he was charged. The evidence
fails to connect the prisoner with the offence charged, or even to
disclose a motive for the offence.

Argued at Richmond.   Decided at Wytheville.

Error to a judgment of the County Court of Patrick county,
rendered December 4, 1897, upon an indictment against the
plaintiff in error for murder.

*Reversed.*

The indictment contained a number of counts, in some of
which the plaintiff alone was charged with the murder, and in
others it was charged that the murder was committed jointly
by the plaintiff in error and Albert King and Edgar King  The
plaintiff in error elected to be tried separately.  There was a
demurrer to the indictment and to each count thereof, and the
ground of the demurrer was that the indictment should have
been either joint or separate in every count thereof, and was
defective because some of the counts charged the plaintiff in
error alone, and others charged him together with Albert King
and Edgar King.   The demurrer was overruled.

A motion was made to quash the writ of *venire facias* which
was also overruled by the trial court.   The writ of *venire facias*
was issued by the County Court of Patrick county and directed
to the sheriff of that county, and commanded him to summon
sixteen persons of Floyd county to be taken from a list to be
furnished by the judge of Patrick County Court, &c.   The list
was furnished by the judge of the County Court of Patrick
county, and the return of the sheriff was "I summoned the above
named persons from the list furnished me by the judge of the
County Court of Patrick county."   The ground of the motion to
quash the writ was "First, because the writ does not show that

Floyd county is one of the counties of this Commonwealth; and, secondly, because the return of the sheriff does not show that the persons summoned were either citizens of the county of Floyd or State of Virginia." The other facts sufficiently appear in the opinion of the court.

*John W. Carter* and *E. J. Harvey*, for the plaintiff in error.

*Attorney-General A. J. Montague*, for the Commonwealth.

KEITH, P., delivered the opinion of the court.

Charles McBride was indicted in the County Court of Patrick county for the murder of A. B. Cranford, and upon his trial was found guilty of murder in the second degree and sentenced to the penitentiary for 18 years. He thereupon applied for a writ of error to the Circuit Court of Patrick county, which was refused, and the case is now before us upon a writ of error awarded by one of the judges of this court.

The first assignment of error is to the judgment of the County Court overruling the prisoner's demurrer to the indictment. This assignment of error is not well taken, the indictment being, in our opinion, sufficient.

The second assignment of error is to the judgment of the County Court in overruling the motion to quash the writ of *venire facias*. We are of opinion that the judgment of the County Court was right, and the grounds of error assigned are not of sufficient importance to warrant any extended discussion of them.

During the progress of the trial a witness was asked the following question: "State what A. B. Cranford said that evening, if he said anything, as to where he was going." To which the witness made answer: "He told me he was going home to kill his hogs next morning; that he had promised his wife to meet her at home that night; that she had staid at her father's the night

before, but would be at home that night." This question and answer were objected to by the prisoner, and his objection being overruled, he took a bill of exceptions, and this ruling constitutes the third assignment of error.

The same proposition is involved in the fourth, fifth, and sixth · assignments of error.

The conversation referred to by the witness took place between himself and the deceased on the evening of the day preceding the homicide. The question and answer should have been excluded. It is as to the prisoner *res inter alios acta,* constitutes no part of the subject under investigation, is not connected with it in time or place, was had in the absence of the prisoner, and can be brought within none of the exceptions under which such evidence is admitted. We are of opinion that the County Court erred in admitting the declaration of A. B. Cranford as set out in the third, fourth, fifth and sixth bills of exception.

The seventh assignment of error rests upon objection made by the prisoner to the admission of certain statements made by Pedigo, a witness for the Commonwealth. He was asked the following questions: "Did you make any search of the house of Albert King, who is jointly indicted for the murder with the prisoner, and if so, what did you find?" To which the prisoner replied: "Yes, I found a rope that had been tied in a peculiar way and had the appearance of having been washed. * * * * The rope was found under a plank in the loft of an old kitchen which then looked like it was being used for a lumber room. I also found behind the door-facing of the same room a piece of bluish-green paper similar to that found at the head of the dead man. * * * * The floor of King's house seemed to have been recently scoured."

Trial courts are necessarily clothed with a large discretion as to the order in which evidence is to be admitted, especially where the proof of a fact depends upon circumstantial evidence. It would be inconvenient, sometimes, indeed, impossible, to submit the proof of all the intermediate circumstances relied upon to

establish the principal facts under investigation in logical order and sequence. It is therefore proper for a trial court to admit evidence which only becomes relevant by the introduction of other evidence at a later stage of the cause; but where this is done the jury should be cautioned that it is not to be considered unless testimony is introduced connecting it with the subject under investigation, and in the event that such evidence is not produced that which was admitted under the expectation of its production should be excluded. As this assignment of error is one of the most important that appears in the record, it is worthy of careful consideration.

A. B. Cranford, the deceased, a citizen of Patrick county, was last seen alive on the evening of the second day of January, 1896, at the house of Sam Nunn. He came to Nunn's house about dark, and left about seven o'clock. His body was found some days afterwards one-half mile from Nunn's house, in a piece of woodland about 80 yards from the road, partially concealed with leaves. The back of his head had been crushed by a blow which shattered the bone and reduced the brain to a disorganized mass. The jugular vein had been severed, 13 other wounds appeared upon his person and a load of shot had been fired through his head, but the physicians testify, he was already dead when shot. He was found lying upon his face. The vicinity was searched, but no trace of the murderer could be found. After a time Charles McBride was charged with the crime, was arrested, and an indictment was found against him, and Albert King and Edgar King jointly, charging them with the murder. There is not a particle of evidence in the record which tends to prove the presence of the prisoner at or near, or within several miles of, the place at which Cranford's body was found until he was seen there in company with those who were making search for the deceased. There is no evidence that connects him in any way with Albert or Edgar King or with the house in which the rope was found. The Commonwealth, in order to bring the prisoner within the reach of the deceased and afford him the opportunity

for the perpetration of the crime, conceived the theory that Cranford was not murdered at the place where his body was found, and it may be conceded that there are considerations which tend in some degree to support this hypothesis. As Charles McBride could not be proved to have been in a position to commit the murder where the body was found, it was necessary either to acquit him, or to satisfy the jury that Cranford had been murdered at a point accessible to McBride, and thus add opportunity for the commission of the crime to other circumstances adduced upon his trial. Certain abrasions and bruises were found upon the arms and legs of Cranford, and a free rein being given to the imagination, the loops in the rope concealed in the house of Albert King at once suggested it as the means by which the mutilated body of Cranford was carried from the scene of the actual murder to the place where it was found. It will be observed, however, that Cranford's jugular vein was severed and the physicians testify that there was no blood left in the body; that a bruise cannot be made upon the body after death, and finally, that the abrasions and bruises upon his legs were longitudinal, while a rope would have caused a bruise around his leg and not in the direction of its length. There is an inherent improbability about the whole incident of the rope. Assuming that a method so extraordinary should be resorted to for the purpose of concealing a crime as to tie the body of the victim by its legs and arms with a rope and carry it for miles across the country swinging from a pole and passing a number of occupied houses, it exceeds all conceivable folly that the rope should have been carefully preserved, washed and concealed by the murderers when it could easily have been burned, or in some way destroyed, leaving no trace of its existence.

But apart from its improbability, there is nothing which tends in any degree to connect the prisoner with it. It is true that he was seen in the possession of bluish paper which he used as gun-wadding, similar, though not identical in texture and color to that found near the head of the deceased, and at King's house;

but the evidence also shows that paper like it was used as wrapping paper by a merchant in the vicinity at whose store the people in this neighborhood made their purchases, but even this scintilla of proof has no bearing upon the rope, or upon the recent scouring of the floor.   We are of opinion that this assignment of error was well taken.

The eighth assignment of error is to the action of the court in overruling an objection to part of the answer made by Cass Cook to a question by the prisoner's counsel.   Cook was asked "if he did not on one occasion go home from church with the wife of the deceased," to which he answered, "Yes," and then went on to say: "As I was leaving church she came up and took hold of me and would not let me go until we had gone about a half of a mile.   She begged me not to come down here as a witness against McBride, and said if I did and he was convicted her father and brother would get into it."   The prisoner by counsel objected to this conversation, but the court overruled his objection.   McBride was at that time in jail, and this conversation was clearly inadmissible.   It was not called for by the question propounded by the prisoner's counsel to Cass Cook, and he should not have been permitted, upon the pretext of making an uncalled for and unnecessary explanation, to introduce irrelevant and injurious testimony against the accused.

The ninth assignment of error is to the testimony of R. S. Collins and to the introduction of a deed from W. E. Cranford to A. B. Cranford, and from A. B. Cranford to Ruby Cranford. The object of this evidence seems to have been to fasten upon the prisoner a motive for the crime with which he was charged. The only evidence which connects the prisoner with it is that A. B. Cranford, the deceased, the grantee in the first deed, when he went to the house of Collins, the Justice of the Peace who wrote the deed and took the acknowledgment, was, to use the language of Collins, "riding a mule which I supposed belonged to Jeff McBride, the father of the prisoner"; and the testimony of C. R. Martin, clerk, "that on the 14th of December, 1895, the two

deeds were brought to him for recordation by the prisoner who
handed them to the clerk and the sum of $2.00 to pay for their
recordation." Martin says: "I told the prisoner that the fee for
recording both deeds was $3.50, and that the amount given me
was not sufficient, and he replied that it was all the money that
had been sent by him." Martin then adds: "It is not unusual
for neighbors coming to court to bring deeds for recordation,
but this was the only time he brought any deeds to me for
record." That such evidence should have been offered as tend-
ing to prove a motive for the perpetration of this crime illus-
trates the poverty of the proof on the part of the Commonwealth.
It should have been excluded by the court.

The tenth assignment of error has been sufficiently disposed of
by what has been said with reference to the ninth.

When the evidence of Pedigo with respect to the rope, to
which the prisoner objected, was offered, the court admitted it,
but stated that it would require the Commonwealth to connect
the prisoner with it, or it would be excluded. After all the evi-
dence was in, the prisoner moved the court to exclude the testi-
mony, but it refused to do so, and thereupon the prisoner ob-
jected. What has been said with reference to the seventh
assignment of error renders any further discussion of this assign-
ment unnecessary.

The twelfth and thirteenth assignments of error were not
pressed.

The fourteenth assignment of error is to an instruction asked
for by the Commonwealth and given by the court. The instruc-
tion is as follows:

"The court instructs the jury that if they believe from the
evidence that time, place, opportunity, threats, means and
motive, and prisoner's after-conduct all concur, beyond a reason-
able doubt, as before explained in pointing out the accused as
the perpetrator of the crime, and that the evidence discloses no
other criminal agent, and though no human eye-witness has
testified to the fatal blow or blows, yet this will be sufficient to

warrant a conviction, if the jury shall believe from the evidence, beyond a reasonable doubt, that the accused is guilty of the offence charged, in other words, it is not all crime where there is or can be any eye-witness, and it is for the jury to say whether from all the evidence the prisoner's guilt has been proven to their satisfaction and beyond a reasonable doubt, and whether that evidence be direct or circumstantial, and in all capital cases the evidence must be carefully scanned and reviewed by them."

The objection made by the prisoner is that the jury are told that the failure of the evidence to disclose any other criminal agent than the prisoner is a circumstance which may be considered by the jury in determining whether or not he was guilty of the crime wherewith he was charged. This is not the law. The prisoner is presumed to be innocent until his guilt is established, and he is not to be prejudiced by the inability of the Commonwealth to point out any other criminal agent, nor is he called upon to vindicate his own innocence by naming the guilty man. He rests secure in that presumption of innocence until proof is adduced which establishes his guilt beyond a reasonable doubt, and whether the proof be direct or circumstantial it must be such as excludes any rational hypothesis of the innocence of the prisoner. We think the court erred in giving this instruction.

The last assignment of error is to the refusal of the court to set aside the verdict as contrary to the law and the evidence.

A discussion of what the evidence tends to prove is rarely profitable, and in this case is rendered unnecessary by what has already been said in disposing of objections to· its admission. We are of opinion that the evidence is wholly insufficient to warrant the prisoner's conviction.

As was said in the case of *Grayson* v. *Commonwealth*, 6 Gratt. 712: "There is no evidence which connects the accused with the homicide of which he has been convicted, and it is plainly insufficient to warrant the verdict."

The judgment of the County Court must, therefore, for the reasons stated, be reversed.

*Reversed.*