## Richmond.

## ADDISON MOHLER V. COMMONWEALTH.

### March 16, 1922.

### Absent, West, J.

1. ATTORNEY AND CLIENT—*Transcripts of Record of Previous Proceedings—Attorney's Right of Access to such Transcripts.*—Transcripts of the evidence previously given at a prior trial or proceeding, when brought into court for use, cease to be strictly private property, and opposing attorneys should then have equal access thereto. This access is so essential in the interest of justice that if the courtesy usually accorded is not sufficient to secure it, and the question is raised during the trial for the first time, then the trial court should exercise all of its powers to that end. The only condition which an attorney possessing such a transcript has any right in advance of the trial to impose is to require of the opposing attorney, who demands it, the amount which is necessary in order to pay for a copy thereof.

2. APPEAL AND ERROR—*Reversal for Error in Admitting and Excluding Evidence—Case at Bar.*—In the instant case, exceptions were taken to testimony which the court at one time refused to admit, and thereafter admitted, and to evidence which was at one time admitted and thereafter excluded. While it is most important that all legal testimony should be promptly admitted and all that is illegal promptly excluded and prevented, if possible, still, as this is practically impossible, all that is necessary in most cases is that the trial court shall correct its errors of this character as promptly as possible and before the case is submitted to the jury. To hold such errors in procedure ground of reversal in every case would lead to many reversals, when upon the merits the case has been properly decided.

3. APPEAL AND ERROR—*Harmless Error—Incompetent Evidence where there is Competent Evidence to the same Effect.*—Where the insignia on the clothing of deceased, a discharged soldier, were otherwise sufficiently identified, there was no harmful

error—indeed, if there were any error at all—in permitting a witness to testify that he had heard the different badges worn by soldiers in the United States army in the world war discussed, although he said he knew nothing about these insignia.

4. EXPERT AND OPINION EVIDENCE—*Bloodstains—Purchase of Serum to Test for Bloodstains.*—There was no error in admitting a fully qualified medical expert to testify that, in his opinion, certain stains submitted to him for examination were made by human blood, although he testified that he did not use serum made by himself, but that he bought a serum prepared for the express purpose of making such blood tests from recognized chemists, and that before using it he fully tested it, to discover whether it was reliable.

5. HOMICIDE—*Evidence—Testimony of Witness as to Questions Asked Her by Accused—Inference of Accused's Guilt from such Testimony.*—In a prosecution for homicide, a witness was sent for by the accused and asked whether or not, when she at one time occupied a cabin on his premises in which the alleged human blood had been discovered, her son had not cut his foot and bled there. In response to a question by the court, this witness said that she thought accused wanted her to testify about that blood, "but you know I can't tell what was not so."

    *Held:* That there was no sufficient reason for the jury to infer that accused was endeavoring to secure false testimony, but, however that might be, in a case entirely dependent upon circumstantial evidence, like the instant case, the prosecution was entitled to have the jury consider this evidence.

6. HOMICIDE—*Circumstantial Evidence—Expression of Opinion by Witness.*—In a prosecution for homicide, where the prosecution was relying upon circumstantial evidence for a conviction, testimony of a witness that when he was shown a certain substance which might have been dried blood and asked, "What do you call this?" that he said, "This is enough for me," the accused being then under suspicion, was prejudicial error, as expressing the opinion of the witness as to the guilt of accused.

7. HOMICIDE—*Hearsay Evidence—Effect of Instructing Jury to Disregard the Evidence—Fact Established by Other Unobjectionable Evidence.*—In a prosecution for homicide, a witness testified that deceased had told her on the day that he disappeared that he was going up to the home of the accused that night. This evidence, after being admitted, was struck out by the court, who told the jury to disregard it, and moreover it might have been regarded as harmless, because the inference that deceased expected to meet the accused that night was otherwise

fully and sufficiently proved, and indeed admitted by the accused himself.

8. HOMICIDE—*Declarations and Admissions—Conversations of Accused Relative to Disappearance of Deceased.*—Alleged conversations between a witness and accused with reference to the disappearance of the deceased are admissible in a prosecution for homicide.

9. HOMICIDE—*Evidence—Expressions of Opinion of Accused's Guilt.*—On a prosecution for homicide a witness testified that she had loaned a flashlight to deceased, and that after the homicide accused brought her a flashlight that looked like the one loaned, and that when she told this to her brother-in-law, he said: "I have told you all the time that" accused "knew about this."

   *Held:* That the admission of this evidence was prejudicial error, it being an expression of opinion of another to the witness of the guilt of the accused.

10. HOMICIDE—*Evidence—Expression of Opinion of Accused's Guilt.*—Although a trial for homicide was greatly prolonged, and on a number of occasions illegal testimony was admitted which the trial judge told the jury must be excluded, and although the trial judge doubtless thought that he had told the jury so often that they fully understood that they should not consider the mere opinions of others as to the guilt or innocence of the accused, yet, in a case depending upon circumstantial evidence, a single error of this sort might be harmful and ground for reversal.

10. HOMICIDE—*Evidence—Harmless Error—Matter Fully Developed at a Later Time—Witnesses—Impeachment.*—The refusal to require a witness to answer a question as to whether she had tried to get a forged prescription for morphine filled was harmless, where the whole matter was fully developed at a later time in the trial and was only introduced for the purpose of discrediting the witness.

12. HOMICIDE—*Evidence—Evidence Objected to Adduced by Counsel for Accused on Cross-Examination.*—Where the very same testimony objected to by accused as incompetent was adduced by counsel for the accused on cross-examination, the error, if not waived, is harmless.

13. EXPERT AND OPINION EVIDENCE—*When Opinion of Nonexpert Admissible—Homicide.*—In a prosecution for murder, a witness testified that he visited the cabin in which it was alleged that the murder occurred, and had there seen lying back against the wall, covered with an overcoat or fertilizer sacks, an object which looked to him very much like a man. Upon

a question of whether it might not have been a pile of rags or something, he answered: "I cannot think it. I think it was a man's body."

*Held:* That this evidence was not admissible as being a mere opinion of the witness, he having stated fully all the facts which he said he had observed.

14. EXPERT AND OPINION EVIDENCE—*When Opinion of Nonexpert Admissible—Common Appearances or Facts.*—The exception to the general rule that witnesses cannot give opinions is not confined to the evidence of experts testifying on subjects requiring special knowledge, skill or learning, but includes the evidence of common observers, testifying to the results of their observation made at the time in regard to common appearances or facts, and a condition of things which cannot be reproduced and made palpable to a jury. Such evidence has been said to be competent from necessity, on the same ground as the testimony of experts, as the only method of proving certain facts essential to the proper administration of justice. Nor is it a mere opinion which is thus given by a witness, but a concluson of fact to which his judgment, observation and common knowledge has led him in regard to a subject matter which requires no special learning or experiment, but which is within the knowledge of men in general.

15. HOMICIDE—*Evidence—Expression of Opinion of Guilt—Instruction by Court to Disregard Opinion.*—On a prosecution for homicide, testimony of a witness that "From his looks, I considered him (accused) the guilty man," was harmless, where the court promptly excluded the testimony from the consideration of the jury.

16. HOMICIDE—*Trial—Conduct of Commonwealth's Attorney.*—Where a witness failed to be as emphatic as the Commonwealth's attorney expected him to be in his imputations against the accused under the leading of the Commonwealth's attorney, it was improper for the Commonwealth's attorney to seek by a question to convey to the jury his own more positive impressions as a witness.

17. HOMICIDE—*Evidence—Commonwealth's Attorney as Witness—Expression of Opinion of Guilt.*—While undoubtedly in a prosecution for murder the Commonwealth's attorney as a witness could testify as to the demeanor of the accused, and as to all the facts which he observed while investigating the crime, nevertheless his expressions of opinion that the accused was guilty clearly violated the rule prohibiting opinion evidence.

18. HOMICIDE—*Evidence—Commonwealth's Attorney as Witness—Expression of Opinion of Guilt.*—Testimony by the Common-

wealth's attorney that, when investigating the crime, he said to another upon the finding of a blood-stained rock, "That beats the devil; I have got all I want," amounted to an expression of his opinion that the accused was guilty, and hence clearly violated the rule prohibiting opinion evidence.

19. ATTORNEY AND CLIENT—*Witnesses—Commonwealth's Attorney as Witness.*—When one deems it to be his duty to testify in a case in which he also appears as an attorney, he is, while a witness, subject to all the limitations imposed upon other witnesses, and when the prosecuting attorney does so he is under the added sanction of his high office, which, while if convinced that the evidence justifies a conviction, imposes upon him the duty to prosecute vigorously and fearlessly, also requires him to respect all of the legal rights of the prisoner.

20. ORDER OF PROOF—*Criminal Law—Discretion of Court.*—Of course, it is the duty of the prosecuting attorney to introduce all of the testimony upon which he relies before the defendant is required to introduce that upon which he relies for his defense, but this is a matter which rests largely in the discretion of the trial court, and, unless abused, the exercise of such discretion is not ground for reversal.

21. PRESUMPTIONS AND BURDEN OF PROOF—*Duty of Commonwealth's Attorney to Respect Presumption of Innocence.*—The presumption of innocence attends an accused person at every stage of the trial until his conviction, and the prosecuting attorney should respect this presumption.

22. COMMONWEALTH'S ATTORNEY—*Time for Argument.*—Upon a prosecution for murder, accused objected to the following question by the attorney for the Commonwealth upon cross-examination of accused: "Do you tell this jury that a woman who has charged you with murder and gone on the stand, and on five different occasions, according to their statement, made statements which, if believed, will put you where the lights don't burn? Do you mean to tell them that you are not mad at that woman? A. I told you I am not mad."

*Held:* That the question amounted to argument by the Commonwealth's attorney during a period of the trial when he had no right to argue, and while, if considered alone, it might not be ground for reversal, yet, when considered with the other circumstances of the trial, it created a conviction that the prisoner was not tried in that calm environment which should attend a judicial investigation.

23. APPEAL AND ERROR—*Criminal Law—Consideration of a Number of Irregularities.*—In the heat of a contest it is impossible to avoid some irregularities, and in the instant case, notwith-

standing the repeated efforts of the trial judge, there were irregularities, no single one of which would have justified a reversal of the case; nevertheless, when they are considered in their entirety, together with the fact that hearsay testimony was heard by the jury, though in most instances they were told by the court to disregard it, a new trial should be granted.

24. HOMICIDE—*Res Gestae—Statements of Deceased that He was Going to the House of Accused.*—Statements of deceased to witness that he was going up to the house of accused; that accused had invited him up there and that his girl was to be there, occurring at a place less than a mile from the scene of the alleged murder, while deceased was going along the road in that direction, and upon the last occasion on which deceased was seen alive, were admissible as part of the *res gestae*, especially where accused has admitted that deceased had asked him twice where he would be that night.

25. HOMICIDE—*Res Gestae.*—Testimony showing the expressed purpose of the deceased as to where he was going and his reason for doing so, and contemporaneous action in execution of such purpose, is admissible as clearly part of the *res gestae*.

26. CRIMINAL LAW—*Character of Accused—Time at which Character in Issue.*—When the accused person testifies in his own behalf, his credibility may be attacked just as that of any other witness may be attacked; that is, the question to be investigated is the reputation of the witness for truth and veracity as of the time at which he testifies. But one who proves his good reputation as a peaceful and law-abiding man is entitled to have that considered by the jury as it existed at the time of the alleged crime, and not as it may have been subsequently affected by the fact that he had been accused of committing it.

27. WITNESSES—*Impeachment—Knowledge of Witness' Reputation for Truth and Veracity.*—Where a witness was introduced by way of defense to repel an attack on the reputation of another witness for truth and veracity, and testified that he possessed the information which is usual in such cases, that he had known the witness sought to be impeached well for many years, and had never heard his reputation for truth and veracity questioned or discussed in the neighborhood, and that he would believe him on oath, his testimony is admissible, notwithstanding that upon cross-examination in response to a question as to whether he knew the witness' reputation for truth and veracity, he replied, "No." The modern tendency is to relax the stringency of the ancient rule and to admit such negative testimony.

Error to a judgment of the Circuit Court of Rockbridge county.

*Reversed and remanded.*

The opinion states the case.

*Hugh A. White* and *Chas. S. Glasgow,* for the plaintiff in error.

*John R. Saunders, Attorney General; J. D. Hank, Jr., Assistant Attorney General,* and *Leon M. Bazile, Second Assistant Attorney General,* for the Commonwealth.

PRENTIS, J., delivered the opinion of the court.

The accused has been convicted of murder in the second degree, and is here assigning numerous errors.

[1] Exception No. 2 arose out of these circumstances: There had been an inquest over a dead body, alleged to be that of Aubrey Tyree, and a stenographic report of the evidence taken at that inquest had been made at the expense of the attorney for the Commonwealth, but the coroner, as it was charged, had not filed that transcript, but had merely a synopsis thereof with the inquest. Then there had been a previous trial of the case, and the jury had failed to agree. The attorneys for the accused had a stenographic report of the evidence taken on that trial, and they desired the tran-. script which had been made at the coroner's inquest, while the prosecutor desired that which had been made at the first trial. Each refused to furnish the other with these documents. There was a wordy controversy growing out of this, in which a personal difficulty was threatened, which, if not unseemly, was certainly lacking in that courtesy which should always characterize proceedings in court for the investigation of the truth. Such bickerings needlessly consume the valuable time of the court, as well as that of

the jurors and witnesses whose attendance is enforced. They justify, in some measure, the criticisms of the administration of justice, and hinder the ascertainment of the truth by diverting the attention of the jury from the evidence from which alone the issues of fact presented must be by them determined. It is, moreover, proper here to emphasize the fact that whatever the character of the case, attorneys at law are duly sworn to aid in the administration of justice, can never be under any obligation to defeat it by withholding any pertinent fact, and only by absolute frankness can the appearance of evil be avoided. The witnesses had been examined on several occasions with reference to the accusation, and it is a manifest advantage to an attorney to have a stenographic copy of the testimony previously given so as to elicit all the facts by him deemed pertinent. The opposing attorney should not be denied an equal advantage. Such transcripts of the evidence previously given, when brought into court for use, cease to be strictly private property, and opposing attorneys should then have equal access thereto. This access is so essential in the interest of justice that if the courtesy usually accorded is not sufficient to secure it, and the question is raised during the trial for the first time, then the trial court should exercise all of its powers to that end. The only condition which an attorney possessing such a transcript has any right in advance of the trial to impose is to require of the opposing attorney who demands it the amount which is necessary in order to pay for a copy thereof. In this case, after this angry, unnecessary wrangle, and at the suggestion of the court, the transcript was furnished to the attorney for the accused; so that the occurrence does not support the assignment of error.

*Brown* v. *Commonwealth,* 90 Va. 676, 19 S. E. 447, can be distinguished from this case because there the stenographic copy was not brought into court by its owner for

use, but the accused sought during the trial to enforce its production for his own use.

[2] Exception No. 3 and several others relate to testimony which the court at one time refused to admit, and thereafter admitted, or to evidence which was at one time admitted, and thereafter excluded. While it is most important that all legal testimony should be promptly admitted and all that is illegal promptly excluded and prevented, if possible, still as this is practically impossible, all that is necessary in most cases is that the trial court shall correct its errors of this character as promptly as possible and before the case is submitted to the jury. There is no other practical way of administering justice, and to hold such errors in procedure ground of reversal in every case would lead to many reversals, when, upon the merits, the case has been properly decided. We find here that the trial court corrected most of them which were material, and this exception is not well taken. *Carpenter* v. *Smithey*, 118 Va. 533, 88 S. E. 321; *Hollen* v. *Crim & Peck*, 62 W. Va. 454, 59 S. E. 172.

[3] The fourth error assigned is based upon certain testimony of R. R. Ruff. The deceased was a discharged soldier of the twenty-ninth division, sometimes called the "Blue and Gray," and in identifying the body it appeared that he had on a uniform with the insignia of that division. The objectionable testimony is that this witness, having testified that he knew nothing about these insignia, said that he had heard the various service stripes discussed; it being suggested by other testimony that there might be some doubt as to whether the deceased belonged to the "Blue and Gray" division, or to the "Blue Ridge" division. The insignia on the clothing were otherwise sufficiently identified, and we find no harmful error—indeed, if there be any error at all—in permitting the witness to testify that he had heard these different badges discussed.

46

[4] Assignment No. 5 relates to the evidence of Dr. J. H. Whitfield, a medical expert, who testified that, in his opinion, certain stains submitted to him for examination were made by human blood, and that the substances submitted to him for tests were human blood. This witness is the coroner of the city of Richmond and fully qualified as an expert in such chemical analyses. He testified that he first undertook to produce the serum which was necessary, by inoculating rabbits, but for reasons, which he explained, determined not to use the serum so made by himself in a test of such a delicate nature and probably having such far-reaching consequences. Instead thereof, he bought a serum prepared for the express purpose of making such blood tests by Parke, Davis & Co., who are recognized chemists; that before using it he fully tested it, in order to discover whether it was reliable, upon samples of blood which he knew to be human blood, as well as upon samples of the blood of a chicken, a hog, a mule and a sheep, and that when thus fully tested it indicated that it had been properly prepared and was in all respects suitable for such a test. The testimony of this witness is singularly clear and satisfactory, was properly introduced in every respect, and worthy of the consideration of the jury in their determination of the fact which the Commonwealth was endeavoring to establish. The assignment is clearly without merit. *Lindsay* v. *People,* 63 N. Y. 156; *State* v. *Knight,* 43 Me. 133.

[5] Assignment No. 6 grew out of the fact that a witness, Mrs. Dale, was sent for by the accused while he was in jail, and asked whether or not when she, at one time, occupied the cabin in which the alleged human blood had been discovered, her son had not cut his foot and bled there. She told him that she knew of no such occurrence, and, in response to one question of the court, she said: "Well, I think he wanted me to testify about that blood, but you

know I can't tell what was not so." The inquiry of the accused was perfectly natural, consistent with his innocence, his motive therefor was obvious, and he had the right to secure the evidence of the fact suggested, if true. She could, however, only supply the information which she possessed, and this answer only emphasized what was already apparent. There appears to us no sufficient reason for the jury to infer therefrom that the prisoner was endeavoring to secure false testimony, and if we are mistaken about this, the interview took place, and in a case like this, so entirely dependent upon circumstantial evidence, the prosecution was entitled to have the jury consider it.

[6] The seventh assignment is more serious in its nature. It grows out of the admission of certain testimony of the witness, Frank Miller. Bearing in mind that the prosecution is relying upon circumstantial evidence to convict the prisoner, we find that this witness testified that on one occasion he went into the unoccupied cabin hereinbefore referred to, but did not notice any stains of any kind, and that on the second occasion he observed certain stains, but couldn't say they were made by blood, and then this question and answer appear: "What did they look like, as near as you can figure out? A. Well, I got me a piece out of a crack that seemed to me it must have been blood; I picked it out of a crack in that burning—in other words, Lon handed it to me and said, 'What do you call this?' and I put it in my fingers and I said: 'This is enough for me.'" The accused excepted, and the reason for his exception is perfectly manifest. The meaning of the objectionable answer is not, as the Commonwealth now claims, merely the opinion of this witness that the substance was blood. The objectionable part of the answer is that the witness said to his companion: "This is enough for me." The accused was under suspicion, and the question of his guilt or innocence was in their minds, so it is manifest that when the wit-

ness said "This is enough for me," one inference to be drawn therefrom when made under these circumstances was that he, the witness, was thereby convinced of the guilt of the accused. If it were clear that he was only expressing his opinion that the substance was blood, we might ignore this as immaterial and harmless. Fairly construed, however, it is the opinion of the witness as to the guilt of the prisoner, and it was allowed to go to the jury, notwithstanding the specific exception of the prisoner. It seems to us that it was highly prejudicial, and that the court should have promptly instructed the jury, as it frequently did during the course of the trial as to other opinion and hearsay testimony, that they should ignore it, that they must decide the case upon legal testimony and draw their inferences from the facts proved; and that the opinion of this witness should not be allowed to prejudice the prisoner's case. The court should have sustained this exception, and the failure to do so was prejudicial error.

[7] The eighth assignment of error is based upon the testimony of the witness, Jessie Chaplin—the woman in the case—to the effect that the deceased had told her on the Saturday that he disappeared that he was going up to the home of the accused that night. This evidence, however, after being admitted, was struck out by the trial court, who told the jury to disregard it. It might have been harmless for another reason, because the inference that Tyree was expected to meet the accused that night was otherwise fully and sufficiently proved—indeed, it was admitted by the accused himself that the deceased had inquired of him where he would be that night and been told that he would be at home. So that this assignment is without merit.

[8] The ninth assignment of error is clearly without merit, for the exception is to the fact that the witness, Jessie Chaplin, was allowed to detail alleged conversations between the accused and herself with reference to the disappear-

ance of the deceased, and no authority is needed to support the well-established doctrine that such conversations are admissible testimony.

[9, 10] The tenth assignment is well taken. This witness, Jessie Chaplin, having testified that she had loaned a flashlight to Aubrey Tyree, the deceased, who was last seen alive December 27th, and that thereafter, on January 29th, the accused brought her a flashlight that looked like the flashlight loaned by her to the deceased, was then asked this question: "Whereabouts were you when that was brought to you?" To this she answered: "I was at home. I had went to Staunton to see my father, and when I came back Addison came down and he had it in his overcoat pocket and asked if I would know my flashlight, and I told him I would know whether it was like mine, but I would not know it was mine, and he said that he found one and told me where he found it, and taken it out of his pocket, and I said: 'It is exactly like mine,' and he said that if nobody ever calls for it I could have it. And after that my brother and brother-in-law taken it apart and the battery was cleaned out, and they said: 'Mike, I have told you all the time that Addison knew about this.'" Exception was promptly taken to this answer, but the court overruled it and permitted the entire answer to go to the jury. The statement that her brother and brother-in-law said, "I have told you all the time that Addison knew about this," is so clearly hearsay, the expression of an opinion by others to the witness, and prejudicial to the accused, that we think it unnecessary to say anything more about it.

The trial was greatly prolonged (consuming ten days), and, as it appears to us, unnecessarily, by examination, cross-examination, re-examination and repetition, often in a way which, if not aimless, was certainly futile, and under such examinations witnesses gave illegal testimony which the trial judge, from time to time during the weary process,

would tell the jury must be excluded from their considera-
tion, and it is doubtless true that he had told them so often
that he thought they fully understood that they could not
consider the mere opinions of others as to the guilt or in-
nocence of the prisoner. This, however, does not relieve
this court of the obligation to require the rules of law to be
maintained in such cases. A single error of this sort might
be held harmless, but in this case, so clearly dependent upon
circumstantial evidence, it is especially important that the
mere opinions of nonexperts upon the main fact to be de-
termined by the jury should be carefully excluded. The
failure to exclude this opinion was, in our judgment, er-
roneous and prejudicial to the accused.

[11] The eleventh assignment relates to the refusal of the
court to require this witness, Jessie Chaplin, to answer a
question as to whether or not she had tried to get a forged
prescription for fifty or 100 grains of morphine to be filled
at a drug store, at or about the time of these occurrences.
As this whole matter was fully developed at a later time in
the trial and was only introduced for the purpose of dis-
crediting the witness, we think there is no merit in the
assignment.

[12] The twelfth assignment refers to certain testimony
of the witness, Jessie Chaplin, as to her conversations, agree-
ments and engagements with the deceased about going to
Covington and elsewhere, which occurred at some time pre-
vious to the date of the alleged crime and in the absence of
the accused. It is sufficient to say that the very same tes-
timony was adduced by counsel for the accused on cross-
examination, and, if the exception was not waived, the er-
ror, if any, is harmless.

[13, 14] The thirteenth exception is based upon the re-
fusal of the trial court to strike out an answer of the witness,
Robert P. Jack, to a question asked him while he was under
cross-examination by a juror. This witness had testified that

he had visited the cabin in which it is alleged that the murder occurred, and that he had there seen apparently lying back against the wall, covered with an overcoat or fertilizer sacks, or something else, an object which looked to him very much like a man. He did not examine it sufficiently to be absolutely certain, but quickly left for fear of getting into trouble himself. The object of this testimony was to show that the body of the deceased had been left in the cabin for some time after his death. The juror's question was: "And it might have been just a pile of rags or something?" to which he answered: "I cannot think it. I think it was a man's body instead of a pile of rags." This answer is objected to as a mere opinion of the witness, and the cases of *Hanriot* v. *Sherwood,* 82 Va. 1, and *House* v. *House,* 102 Va. 235, 46 S. E. 299, are cited in support of this contention. This subject has been recently considered by this court in the case of *C. & O. Ry. Co.* v. *Arrington,* 126 Va. 202, 101 S. E. 415. It is there held that answers of this character, which relate to a matter not requiring expert knowledge, are admissible. Such statements are not mere opinions, but impressions drawn from observed facts, sometimes called the "collective facts rule." It is well stated in the case of *Commonwealth* v. *Sturtivant,* 117 Mass. 133, 19 Am. Rep. 401, thus: "The exception to the general rule that witnesses cannot give opinions, is not confined to the evidence of experts testifying on subjects requiring special knowledge, skill or learning, but includes the evidence of common observers, testifying to the results of their observation made at the time in regard to common appearances or facts, and a condition of things which cannot be reproduced and made palpable to a jury. Such evidence has been said to be competent from necessity, on the same ground as the testimony of experts, as the only method of proving certain facts essential to the proper administration of justice. Nor is it a mere opinion which is thus given by a wit-

ness, but a conclusion of fact to which his judgment, observation, and common knowledge has led him in regard to a subject matter which requires no special learning or experiment, but which is within the knowledge of men in general." .

In 9 R. C. L. 191, referring to this subject, the rule is thus summarized: "Facts which are made up of a great variety of circumstances, and a combination of appearances which, from the infirmity of language, cannot be properly described, may be shown by witnesses who observed them; and where their observation is such as to justify it, they may state the conclusions of their own minds. In this category may be placed matters involving magnitude, or quantities, portions of time, space, motion, gravitation, value and such as relate to the condition or appearance of persons and things." 22 C. J. 530.

This witness, Jack, stated fully all of the facts which he said he had observed, and it was not error to permit him, when a juror suggested to him that it might have been a pile of rags or something else, to give as the result of his observation, which required no expert knowledge, that he thought it was a man's body.

[15] The fourteenth assignment of error is based upon the fact that a witness, in testifying to the conduct of the accused on a certain occasion, said, in response to a question by the court: "From his looks, I considered him the guilty man." The court promptly excluded the testimony from the consideration of the jury, and for this reason this isolated occurrence does not constitute harmful error. In this case, however, when it is observed that at other times during the trial, and in disregard of repeated rulings of the trial judge, other witnesses expressed their opinions as to the guilt of the accused to the jury, it may be well doubted, when all of this illegal testimony is reviewed, whether the prisoner was not thereby seriously prejudiced.

[16] As an illustration of our meaning, we observe the following question by the Commonwealth's attorney, addressed to the sheriff, who had assisted him in searching the cabin: "As an officer of the county, isn't it a fact that that man's conduct and actions told you and me to go on ahead, and I told you that we would go in there in spite of hell?" A. "Yes, I stated we went there for the purpose of going into this house, and I didn't see anything in this key business, and it may have been from hearing what we had heard about it. I was not worrying about the key. I wasn't worrying about the key, and I don't recall that it was mentioned but twice." When it is observed that this witness had failed to be as emphatic as was expected in his imputations against the accused under the leading of the Commonwealth's attorney with reference to the specific actions and language of the deceased just before the cabin was searched, it is apparent that the Commonwealth's attorney sought by this question to convey to the jury his own more positive impressions as a witness, and this certainly he had no right to do at this time or in this manner to the prejudice of the prisoner, while the rude language of the question was unnecessary and should not be tolerated in a court of justice.

[17-19] The attorney for the Commonwealth was afterwards sworn and testified with reference to the execution of the search warrant, and this appears as part of one of his answers: "You can tell from the man's demeanor in court that he is not easily frightened. He got very nervous when Mr. Parrent told him when this rock was handed up, and I said, 'That beats the devil; I have got all I want,' and handed it over to Mr. Parrent, and Mohler followed him over to it and asked what it was, and Parrent told him it looked like blood, and this rock came up and I said to Parrent, 'I am done,' and I looked at Mohler and Mohler was spitting as fast as he could and trimming a stick and looked excited, and that is the worst excited I saw him at the time.

No threats were made and there was nothing to excite him but this thing. ˙I felt sorry for the man and turned my face this way." While undoubtedly, as a witness, he could testify as to the demeanor of the accused, and as to all the facts which he observed, nevertheless his expressions to Parrent thus repeated to the jury are merely his opinions, and fairly construed, are the expression of his opinion that the accused is guilty, and hence clearly violate the rule prohibiting opinion evidence. When one deems it to be his duty to testify in a case in which he also appears as an attorney, he is, while a witness, subject to all the limitations imposed upon other witnesses, and when the prosecuting attorney does so he is under the added sanction of his high office, which, while if convinced that the evidence justifies a conviction, imposes upon him the duty to prosecute vigorously and fearlessly, also requires him to respect all of the legal rights of the prisoner.

[20] The fifteenth assignment of error is not well taken, There was much in the testimony about blood, alleged to be human blood, found upon rocks under the cabin in which it was claimed the crime was committed. While the accused was under cross-examination he was asked to say whether certain rocks came out of this cabin and whether or not there were blood-stains on them. Objection was made to any new exhibits at that stage of the trial. We find no harmful error here. Of course, it is the duty of the prosecuting attorney to introduce all of the testimony upon which he relies before the defendant is required to introduce that upon which he relies for his defense, but this is a matter which rests largely in the discretion of the trial court, and, unless abused, the exercise of such discretion is not ground for reversal here. *Southern Ry Co.* v. *Stockdon,* 106 Va. 693, 56 S. E. 713; *Burks* v. *Commonwealth,* 126 Va. 769, 101 S. E. 230.

[21, 23] The sixteenth assignment of error is based upon

this question, propounded to the accused by the attorney for the Commonwealth during his cross-examination: "Do you tell this jury that a woman who has charged you with murder and gone on the stand and on five different occasions, according to their statement, made statements which, if believed, will put you where the lights don't burn? Do you mean to tell them that you are not mad at that woman? A. I told you I am not mad."

Such a question is worthy of criticism. The attorney for the Commonwealth represents the people of the State, who, in their collective capacity, are just as anxious that innocent men shall be acquitted as they are that guilty men shall be convicted. The prosecuting attorney is selected for the purpose of representing this sentiment. The presumption of innocence attends an accused person at every stage of the trial until his conviction, and the prosecuting attorney should respect this presumption. If, after the testimony has been presented and in the performance of his public duty, he concludes therefrom that he should ask for a conviction, it is not only his right, but his duty, to sum up the evidence and, in argument, to give the jury his reasons based thereon for his conclusion that it justifies such conviction. This question ignores these salutary doctrines. It was an argument during a period of the trial when he had no right to argue the case, but when his primary duty was that of aiding in the investigation and ascertainment of all the pertinent facts and presenting them to the jury. If this occurrence stood alone in the case, it is possible that we might not consider it ground for reversal, but when considered along with all the other contemporaneous facts and circumstances, it creates the conviction that the prisoner was not tried in that calm environment which should attend a judicial investigation. Whether guilty or innocent, he is entitled to a trial during which his rights are at all times respected. When the attorney for the accused promptly

objected to this question, instead of withdrawing it, another argument (characterized by the trial judge as "heated") followed, and when the attorney for the accused said that such a question might gravely prejudice his client's interests, the court replied: "There is a possibility in its resulting that way." It seems to us that instead of being followed by such a heated argument, the Commonwealth's attorney should have immediately withdrawn the question and refrained from anticipating his argument to the jury at such an improper time, and that upon his failure to do this and to make a frank acknowledgment of his inadvertence, the court should have promptly and explicitly told the jury that it was improper. We do not underestimate the many difficulties of conducting a trial of this character with absolute propriety from beginning to end, and the general rule is that the discretion of the trial court as to such matters will not be reviewed. In the heat of the contest it is impossible to avoid some irregularities, and in this case, notwithstanding the repeated efforts of the patient and learned trial judge, there were irregularities, no single one of which would have justified a reversal of the case; nevertheless, when they are considered in their entirety, together with the fact that hearsay testimony was heard by the jury, though in most instances they were told by the court to disregard it, we feel that justice requires that the accused shall have a new trial in which there shall not be so many assumptions of his guilt before it has been ascertained by the jury.

This is no novel doctrine, and these general views are fully supported by the following cases: *Gayle* v. *People* (Cooley, J.), 26 Mich. 161; *Scripps* v. *Reilly*, 38 Mich. 15; *People* v. *Wells*, 100 Cal. 462, 34 Pac. 1078; *People* v. *Mullings*, 83 Cal. 138, 23 Pac. 229, 17 Am. St. Rep. 223; *People* v. *Ah Len*, 92 Cal. 282, 28 Pac. 286, 27 Am. St. Rep. 103; *Wyatt* v. *State*, 58 Tex. Cr. R. 115, 124 S. W. 930, 137 Am. St. Rep. 926 (construing a local statute) ; *People* v. *Fleming*,

166 Cal. 357, 136 Pac. 300, Ann. Cas. 1915B, 881; *Cleveland, etc., R. Co.·v. Pritachau,* 69 Ohio St. 438, 69 N. E. 663, 100 Am. St. Rep. 682; *People* v. *Teiper,* 186 App. Div. 830, 175 N. Y. Supp. 206; *People* v. *Fielding,* 158 N. Y. 547, 53 N. E. 498, 70 Am. St. Rep. 495, 46 L. R. A. 641 (note).

The following recent cases in this State, though not precisely applicable, are instructive: *Jessie* v. *Commonwealth,* 112 Va. 887, 71 S. E. 612; *Mullins* v. *Commonwealth,* 113 Va. 787, 75 S. E. 193; *McCoy* v. *Commonwealth,* 125 Va. 7.78, 99 S. E. 644; 3 Wigmore on Ev., sec. 1808.

[24, 25] Number 17 is in substance the same as No. 15, and we find no error in the ruling.

Number 18 refers to a statement made by the deceased, Tyree, to the witnesses Muterspaugh and Wilhelm. This statement was, in effect, that he was going up to Mohler's (the accused); that he had invited him up there and that his girl was to be there. The accused himself had testified that the deceased, on that day at about three or four o'clock in the afternoon, had asked him twice where he would be that night; that on the first occasion he had told him he would be at home, and on the second occasion, when sitting in a buggy with Jessie Chaplin, he had again asked him where he would be, and that he told him that he would be where he had already told him, and she testified as to this interview in her presence that the deceased replied, "I don't know whether I can get there by that time or not, but I will do the best I can." The statements of these two witnesses, Muterspaugh and Wilhelm, occurred at a place upon the road less than a mile from the scene of the alleged murder, and while the deceased was going along the road in that direction, about seven o'clock of the same evening, and upon the last occasion on which any witness positively identified the deceased alive. There is one witness, however, who testified that he saw a man that same evening shortly thereafter and still closer to the scene of the alleged

murder, going along the road with a flashlight in that direction.

In *Dock's Case*, 21 Gratt. (62 Va.) 913, a question precisely similar to that here involved was decided against the contention of the accused. Testimony showing the expressed purpose of the deceased as to where he was going and his reason for doing so, and cotemporaneous action in execution of such purpose, and there admitted as clearly part of the *res gestae.* The case of *Karnes* v. *Commonwealth*, 125 Va. 764, 99 S. E. 562, 4 A. L. R. 1509, does not present a question precisely similar, but what is said there as to this class of testimony and its admissibility represents the view of this court. *McBride's Case*, 95 Va. 818, 30 S. E. 454, and *Mullins* v. *Commonwealth*, 113 Va. 787, 75 S. E. 193, which are relied on here, can easily be distinguished from the case in judgment, for the declarations which were excluded in those cases were not only made in the absence of the prisoner, but there was no evidence that he knew anything about such declarations, and they were not so connected therewith in time or place as to constitute a part of the *res gestae.* The fact that the deceased in this case had a purpose to meet the accused on that night; that he expressed his intention of so doing to the accused, and promptly proceeded to execute that intention, is otherwise clearly indicated— therefore it would have been error on the part of the trial court if it had refused to admit this testimony as a part of the *res gestae.*

The nineteenth and twentieth assignments of error are based upon the action of the trial court in permitting the witness, Vest, to testify as to the reputation of the accused for truth and veracity as of the time of, and immediately before, the trial. This witness had been first introduced by the accused and had testified that his reputation as a peaceable, law-abiding, good, substantial citizen as well as for truth and veracity in the neighborhood in which he lived,

was good.  Being afterwards called by the Commonwealth,
it appeared that before this disappearance the witness was
of the opinion that the accused had a good reputation for
truth and veracity, but that afterwards, in the opinion of the
witness, he could not be believed on oath.

[26]  Similar questions have frequently arisen, and the au-
thorities appear to sustain the view that when the accused
person testifies in his own behalf, his credibility may be at-
tacked just as that of any other witness may be attacked—
that is, the question to be investigated is the reputation of
the witness for truth and veracity as of the time at which
he testifies.  This may be a great hardship upon the ac-
cused, because it frequently happens that the neighborhood
gossip and the suspicions of his guilt, with the consequent
discussion of his criminality, will give him a bad reputation
in the community for truth and veracity, whereas thereto-
fore it had been good.  But, nevertheless, it seems to be the
accepted rule.  28 R. C. L. 620; 82 Am. St. Rep. 34; 20
L. R. A. 616, note.

Care should certainly be taken, however, in the admission
of such testimony.  In this case this witness, Vest, who
had testified as to the good reputation for truth and ve-
racity of the accused previous to the date of the alleged
crime, had also testified to his good reputation as a law-
abiding and peaceful man at and before that time.  Now,
as to this, the rule is different, and in cases in which such
evidence is admissible, one who proves his good reputation
as a peaceful and law-abiding man is entitled to have that
considered by the jury as it existed at the time of the al-
leged crime and not as it may have been subsequently af-
fected by the fact that he had been accused of committing it.

One of the oldest cases is *Carter* v. *Commonwealth,* 2 Va.
Cas. (4 Va.) 169, where it is expressly held that when a
prisoner introduced evidence in support of a general good
character, and the Commonwealth endeavors to impeach it,

the witness who impeaches cannot give in evidence conver-- sations relating thereto held with others subsequent to the commencement of the prosecution.

In *State* v. *Sprague,* 64 N. J. L. (35 Vroom) 423, 45 Atl. 788, the same rule is enforced and the Virginia case cited. It. is the reputation one has in the community up to the time of the commission of the offense only which is admissible. The accusation of the crime should not be allowed to affect his. reputation, so far as proof thereof may be admissible in his defense. *Olive* v. *State,* 11 Neb. 29, 7 N. W. 444. Proof of such reputation, or evidence in denial of such reputation must be limited to the time of the discovery of the offense. *White* v. *Commonwealth,* 80 Ky. 485. Reputation acquired by the crime itself and after its commission is not admissible. *People* v. *Fong Ching,* 78 Cal. 175, 20 Pac. 396; *Skaggs* v. *State,* 31 Tex. Cr. Rep. 563, 21 S. W. 257; *State* v. *Johnson,* 60 N. C. 151, 162, 22 C. J. 480, 20 L. R. A. 612, note; 8 R. C. L. 209

In this case, while the court repeatedly cautioned the attorneys for the prosecution that they could extend their inquiry only as to the reputation of the accused for truth and veracity up to the time of the trial, they repeatedly framed their questions so as not to observe the distinction which the court so clearly expressed. If the attorneys had observed the caution of the trial judge, there would have been no error, but, inasmuch as they failed to do so, this examination discloses error which was prejudicial to the accused.

[27] The twenty-first and twenty-second assignments of error refer to testimony of the witness Hall, introduced in rebuttal by the Commonwealth for the purpose of sustaining the reputation of the witness Jack for truth and veracity. The accused had introduced several witnesses who testi- fied that Jack's reputation for truth and veracity was bad, and the Commonwealth undertook to defend his reputation

and to discredit this adverse testimony by this witness, Hall. While he testified in the usual way, on his cross-examination, in response to the question, "Do you know his reputation for truth and veracity," he replied, "No." Thereupon there was a motion to exclude all of Hall's testimony, which was overruled. It is undoubtedly true that a witness who does not know the reputation of another witness for truth and veracity should not be permitted to testify in support of such reputation which had not been attacked; but here Hall was introduced by way of defense to repel such attack, and had testified that he possessed the information which is usual in such cases; that is, he had known Jack well for many years, and never heard his reputation for truth and veracity questioned or discussed in the neighborhood, and that he would believe him on oath; so that in our judgment, this circumstance presents no ground for reversal. Two other witnesses, Engleman and Wade, were introduced for the Commonwealth, and testified to the same general effect, and no exception was taken to their testimony by the accused. The modern tendency is to relax the stringency of the ancient rule and to admit such negative testimony. 20 L. R. A. (N. S.) 666, note.

We have referred to each of these assignments numerically, in view of the reversible errors which the record discloses, and because the case must be remanded for a new trial. The only other error assigned is the refusal of the trial court to set aside the verdict as being contrary to the law and the evidence. For obvious reasons we deem it improper to express any opinion as to this.

The judgment is reversed because of the errors in procedure indicated, and the case is remanded for a new trial to be had according to law.

*Reversed and remanded.*