# Richmond.

## GINGER v. COMMONWEALTH.

### November 15, 1923.

1. HOMICIDE—*Character in Evidence—General Reputation—Reputation Acquired Post Litem Motam.*—Upon a prosecution for homicide only the general reputation of the accused as a dangerous character is admissible, and even if a witness knows the general reputation of accused he cannot testify to it if that reputation was acquired after the homicide.

2. HOMICIDE—*Opinion Evidence—Belief that a Witness for Prosecution Told the Truth.*—A witness, a prominent man in the community, introduced to prove the good character for truth and veracity of a witness for the prosecution, who had admittedly perjured himself, testified that "I believe that this last tale is true." This last tale was to the effect that the accused was guilty of the homicide charge.

   *Held:* That this was opinion evidence to the effect that the accused was guilty, and was highly prejudicial.

3. HOMICIDE—*Witnesses—Corroboration.*—On a trial for homicide accused asked the court to instruct the jury that they could not convict them upon the unsupported evidence of a witness for the Commonwealth, who was a self-confessed perjurer; but, if his evidence was necessary in order to convict, then they must acquit accused. This the court refused, and gave in lieu thereof an instruction that the evidence of the witness "must be looked upon with a great deal of suspicion, since he is a self-confessed perjurer." The testimony of the witness was not wholly uncorroborated.

   *Held:* That the trial court committed no error.

4. INSTRUCTIONS—*Argued in Chambers—Time of Exception.*—In the instant case, a prosecution for homicide, the Attorney-General made the point that no exception was taken to the ruling of the trial court upon an instruction at the time the instruction was given, and hence the objection could not be considered on appeal. The bill of exception showed that the instructions were argued in chambers, and that when the court announced its opinion counsel for the accused promptly in chambers announced the exception to the ruling, and the bill of exception was prepared and signed after verdict. This was not only sufficient, but the proper course to pursue. It was not necessary to repeat the exception in open court.

Error to a judgment of the Circuit Court of Rockbridge county.

*Reversed.*

The opinion states the case.

*Fred T. Deaver* and *C. S. Glasgow*, for the plaintiffs in error.

*John R. Saunders*, Attorney-General, *J. D. Hank, Jr.*, Assistant Attorney-General, and *Leon M. Bazile*, Second Assistant Attorney-General, for the Commonwealth.

BURKS, J., delivered the opinion of the court.

Sullivan Ginger and Josie Ginger were jointly indicted for the murder of Horace Ginger. They were jointly tried and the verdict of the jury was, "We, the jury, find Sullivan Ginger guilty, as charged in the indictment, of murder in the first degree, and fix his punishment at twenty-six years' confinement in the State Penitentiary. H. C. Slusser, Foreman." "We, the jury, find Josie Ginger guilty, as charged in the within indictment, as principal in the second degree, of murder of the second degree and fix her punishment at ten years' confinement in the State Penitentiary. H. C. Slusser, Foreman." The trial court refused to set aside the verdict, and entered judgment thereon. The case is brought here on a writ of error to that judgment.

Sullivan Ginger is the son, and Josie Ginger the widow, of Horace Ginger, deceased. The theory of the Commonwealth is that Horace Ginger was shot and killed by Sullivan, by the advice or command of Josie Ginger, who was present counselling, aiding and advising the killing. The defense was that Horace Ginger committed suicide. There were present at the killing

Sullivan Ginger, Josie Ginger, Frances Ginger, a daughter of Horace, about twelve years of age, and Sam Lipscomb. On the day of the homicide, Sullivan Ginger and Sam Lipscomb were arrested, charged with the murder of Horace Ginger, and lodged in jail. At the preliminary hearing the next day, Sullivan Ginger, Frances Ginger and Lipscomb testified under oath that Horace Ginger committed suicide and gave in detail the circumstances of his death, and the charge was dismissed. Lipscomb also told several persons, at different times, on the day of the death of Horace Ginger, that Horace had committed suicide. Sullivan Ginger remained around home about two weeks after the death of his father, assisting his mother in moving, amongst other things, and then went to West Virginia seeking employment. About two weeks later, or about a month after the death of Horace Ginger, the indictment in the present case was found, on the testimony of Sam Lipscomb, who was the principal witness for the Commonwealth at the trial, and without whose testimony the verdict could not have been found. He admitted at the trial that he had previously given a false account of the killing and had sworn to what was untrue at the preliminary hearing. His excuse was that Sullivan Ginger had threatened to kill him if he told the truth, and that he was afraid to tell the truth until Sullivan had gone to West Virginia.

As the case will have to be reversed for errors committed during the trial, it will be unnecessary to give the details of the testimony.

The defense had offered no character testimony, but, after they had rested their case, the Commonwealth offered in rebuttal the testimony of E. O. Snyder, the mayor of Glasgow, where the offense was committed, to prove that Sullivan Ginger was a dangerous character. This testimony was objected to by the defendants, but

the objection was overruled and the defendants excepted. After testifying that "he knew the reputation of Sullivan Ginger for being a dangerous character and that it was bad," he was cross-examined and testified as follows:

"Q. Mr. Snyder, the defense will allow you to testify to any specific acts of violence that you may know of having been committed by Sullivan Ginger; what have you known him to do that gives him the reputation of being a dangerous character?

"A. I do not know of anything that he has ever done.

"Q. Then why do you say he is a dangerous character?

"A. Because on the afternoon we went out to his house to arrest him, Sam Gilliam and George Chittum said we had better go prepared. I thought he must be a dangerous character, or they would not want to take such precautions.

"Q. Is that all you know of the reputation of Sullivan Ginger?

"A. Yes, sir. I did not know him at all until after this shooting. I merely knew he was one of the Gingers, but I did not know which one.

"Q. Then you knew nothing of his reputation until after this shooting?

"A. No, sir."

Thereupon counsel for the defense moved the court to strike out the entire testimony of Mr. Snyder, which motion was overruled by the court and to which ruling counsel for the defense noted an exception.

[1] The cross-examination shows that the witness had no knowledge of the *general* reputation of the accused, as to which alone he could testify. *Allison's Ex'r* v. *Wood,* 104 Va. 765, 771-2, 52 S. E. 559. But even if he had known his general reputation he could not testify to it, if that reputation was acquired after the homicide.

In 1 Green. Ev. (16th ed. by Wigmore), sec. 461-d, p. 586, it is said: "But, from the point of view of the trustworthiness of the reputation used as evidencing the character, an objection may be suggested to a reputation obtained *post litem motam, i. e.,* after trial begun or after controversy started, especially in the case of an accused person's reputation; for unfounded suspicions engendered by the accusation may serve to color the reputation and render it untrustworthy, and even a witness' reputation may thus be unfairly affected. For this reason many courts decline to receive a reputation predicated of a time since trial begun or accusation brought or deed committed."

In *Carter* v. *Commonwealth*, 2 Va. Cas. 169, it was held that "when a prisoner introduces evidence in support of his general good character, and the Commonwealth endeavors to impeach it, the witness who impeaches must not give in evidence conversations held with others subsequent to the commencement of the prosecution." The great weight of authority is to the same effect. See cases cited in note to 1 Green. Ev., *supra.*

One other witness for the Commonwealth testified, over the objection of the defendants, that the reputation of Sullivan Ginger "for being a peaceful or dangerous man" was bad; the court stating that "the character of Sullivan Ginger was admissible only to show that Sam Lipscomb may have had reason to fear him."

After this evidence had been introduced over the objection of the accused, they sought to avoid the effect thereof as far as possible by an instruction which they asked and the court gave. That instruction was as follows:

"The court instructs the jury that the evidence submitted as to the character of Sullivan Ginger for being a

bad and dangerous man in his community, is to be considered only in so far as it may have influenced Sam Lipscomb in the evidence which he has offered in this case; and is not to be considered as a fact against the defendant, Sullivan Ginger."

Snyder was the mayor of the town of Glasgow and his testimony was liable to have influence with the jury. His testimony was clearly inadmissible, and while we might not be willing to reverse the case if this were the only error assigned, still there was the cumulative effect of his opinion as to the bad character of Sullivan Ginger and testimony of Charles Locher, hereinafter mentioned, as to his guilt, which was very prejudicial to the accused and on another trial the testimony of Snyder as to the bad character of Sullivan Ginger for peace and good order should be excluded.

[2] The Commonwealth also introduced in rebuttal, over the objection of the defendants, the testimony of Charles Locher, the manager of the Glasgow Clay Products Company, to prove the good character of Sam Lipscomb for truth and veracity, and he testified as follows: "That he lives in Glasgow and is manager of the Glasgow Clay Products Company; that both Sullivan Ginger and Sam Lipscomb have worked for him; that he knows the reputation of both; that he knows nothing against Sullivan Ginger and is not afraid of him himself.

"The following specific questions were asked and answered as follows:

" 'Q. Do you know the reputation of Sam Lipscomb for truth and veracity?

" 'A. Yes; it is good.

" 'Q. Would you believe him on oath, even though you know that he has perjured himself?

" 'A. Yes; I believe that this last tale is true.' "

Counsel for the defense moved to strike out this an-

swer, but the motion was overruled by the court, and the defendants excepted.

This ruling was highly prejudicial to defendants, and for it the judgment of the trial court must be reversed. Mr. Locher was a prominent man in the community and there was great danger that his opinion would have a prejudicial effect upon the jury. His opinion was, in effect, that the accused were guilty, and this opinion should not have gone to the jury. *Mohler* v. *Commonwealth*, 132 Va. 713, 111 S. E. 454.

[3] The defendants then tendered the following instruction:

"The court instructs the jury that they cannot convict the prisoner upon the unsupported evidence of Sam Lipscomb, who is a self-confessed perjurer, but if his evidence is necessary in order to convict, then they must acquit the prisoner."

This the court refused, and gave in lieu thereof the following:

"The court instructs the jury that the evidence of Sam Lipscomb must be looked upon with a great deal of suspicion, since he is a self-confessed perjurer."

In this the trial court committed no error. The testimony of Lipscomb was not wholly uncorroborated Two of the witnesses for the defense testified "that if deceased had shot himself as claimed by some of the witnesses for the defense, brains and pieces of skull would have been blown in the direction of railroad instead of towards house" as they were. The facts are different from those in *Fields* v. *Commonwealth*, 107 Va. 870, 60 S. E. 83, and hence that case is not controlling.

[4] The Attorney-General makes the point that no exception was taken to the ruling of the trial court at the time the instruction was given, and hence the objection cannot be considered. The bill of exception shows that

the instructions were argued in chambers, and that when the court announced its opinion counsel for the accused promptly in chambers announced the exception to the ruling, and the bill of exception was prepared and signed after verdict.    This was not only sufficient, but the proper course to pursue.    It was not necessary to repeat the exception in open court.

As the case has to be reversed for the reasons stated, we express no opinion as to the sufficiency of the evidence to support the verdict.    Other errors assigned were either waived or involve questions not likely to arise on another trial.

The judgment of the trial court will be reversed, the verdict of the jury set aside, and the case remanded to the circuit court for a new trial.

*Reversed.*