**Joseph W. SHIMON, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

No. 19064.

United States Court of Appeals
District of Columbia Circuit.

Argued May 28, 1965.

Decided Sept. 9, 1965.

Mr. Robert L. Weinberg, Washington, D. C., with whom Mr. Edward Bennett Williams and Miss Barbara A. Babcock, Washington, D. C., were on the brief, for appellant.

Mr. Jerome Nelson, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., Frank Q. Nebeker and Harold J. Sullivan, Asst. U. S. Attys., were on the brief, for appellee. Miss Carol Garfiel, Asst. U. S. Atty., also entered an appearance for appellee.

Before FAHY, BURGER and McGOWAN, Circuit Judges.

BURGER, Circuit Judge.

The convictions under review arise out of alleged efforts to impede a Grand Jury investigation into charges of electronic "bugging" by Appellant at private rooms in the Mayflower Hotel in Washington. A three count indictment charged: (1) conspiracy to obstruct justice (18 U.S.C. § 371), (2) obstructing justice (18 U.S.C. § 1503) and (3) willfully and knowingly operating a radio transmitter on an illegal frequency in violation of 47 U.S.C. § 502. A jury found Appellant guilty on the first two counts and not guilty on the third count.

Four points are raised on appeal: (1) whether the Assistant United States Attorney who conducted the allegedly obstructed Grand Jury proceeding could properly be trial counsel for the Government; (2) whether the Special Grand Jury sitting beyond the term prescribed by D.C.CODE § 11–1408 and alleged to have been obstructed by Appellant was a lawful Grand Jury and whether the call-ing of such Grand Jury by a Judge, designated by the Chief Judge but not himself the Chief Judge or Senior Associate Judge sitting in the Chief Judge's absence, was a nullity so that an act of obstructing its processes is not unlawful; (3) whether tape recordings of conversations between two persons other than Defendant in relation to the conspiracy and otherwise admissible are to be suppressed as fruits of an unreasonable search under the 4th Amendment or of a violation of Sections 502 and 605 of the Communications Act because the person called did not consent and was not warned by any electronic signal or otherwise; (4) whether on impeachment of a defense "character" witness by inquiry as to awareness of police trial board proceedings against the Defendant, the witness should be allowed to state the outcome of the proceedings if he also had heard the outcome.

(1)

■ *Participation of Assistant United States Attorney:* The contention that the Assistant United States Attorney was for some reason barred from conducting or assisting the conduct of the Government's case is totally lacking in merit. The resolution of that issue was peculiarly within the sound discretion of the presiding trial judge and there is no basis on this record for disturbing his ruling.

(2)

■ *Grand Jury status:* Appellant argues that the Special January 1962 Grand Jury he is charged with obstructing was sitting beyond the term prescribed by D.C.CODE § 11–1408 (1961 ed.) and that that Grand Jury was not duly impaneled under that statute since it was not called by the Chief Judge of the District Court or the Senior District Judge in the Chief Judge's absence, urging that he cannot therefore be guilty of a violation of 18 U.S.C. § 1503 (1958). Congress' concern with the obstruction of justice may not be avoided by such empty technicalities. Cf. Kay v. United States, 303 U.S. 1, 58 S.Ct. 468, 82 L.Ed. 607 (1938); United States v. Kapp, 302

U.S. 214, 58 S.Ct. 182, 82 L.Ed. 205 (1937). During the period of the events in question here everyone concerned treated the Grand Jury as such, and indeed the record reveals that the parties stipulated at trial that it was an "active and sitting" Grand Jury.

■ Assuming, *arguendo*, that Appellant has standing to assert it here, our recent holding in United States v. Wallace & Tiernan, Inc., 121 U.S.App.D.C. ——, 349 F.2d 222, June 23, 1965, disposes of his contention as to the impaneling of the Grand Jury. Under that case an indictment returned by a Grand Jury impaneled as was the present one is valid, since FED.R.CRIM.P. 6(a) superseded Section 1408. The logic of that case argues as well for the conclusion that this Grand Jury, though acting beyond its term, had the power to indict. See also 28 U.S.C. § 452; FED.R.CRIM.P. 6 (g). Since the Grand Jury could have brought valid indictments, it follows a fortiorari that it could have been a subject of obstruction, whatever may be the case with grand juries so defectively constituted as to be unable to return valid indictments.

### (3)

*Admissibility of recorded telephone conversations:* The District Court admitted in evidence three separate recorded telephone conversations between one Barber and Detective Jones who was named as a co-conspirator in the indictment. No conversation with Appellant is involved. These recordings were obtained when officers accompanied Barber to his office and attached a recording device to his telephone by means of so-called "alligator clips," dialed Jones' number and recorded the conversation.

Various attacks are leveled at the District Court ruling which admitted the recordings in evidence: that recording and disclosing conversations between Barber [1] and Jones was an unreasonable search for evidence in violation of the 4th Amendment and also that absence of warning signals contravened 47 U.S.C. § 502, which provides criminal penalties for violating Federal Communications Commission regulations. It is argued that we should exercise our supervisory powers to exclude evidence so obtained. Appellant further adopts the Government's description of Jones as "Shimon's alter ego" and from that argues that any conversation with Jones by Barber, the Government informant, without the presence of counsel (presumably one representing Shimon's interests as well as Jones'), violated the 6th Amendment and the teachings of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Appellant next contends that Jones did not consent to the recording or disclosure; and finally that the use of "alligator clips" rather than a conventionally established telephone extension [2] is an interception under Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957), and Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942).

■ The first and complete answer to Appellant's challenges to admission of the recordings is that he was not a party to the conversations and hence has no standing to raise either the constitutional or

---

1. Appellant was charged with corruptly endeavoring to influence Barber's testimony before the Grand Jury.

2. Appellant argues for a distinction between overhearing a conversation on a regularly installed pre-existing telephone extension and a temporary device attached with the consent of one of the parties to the call. *Rathbun* would seem to dispose of this in pointing out that a con- ventional telephone extension is simply one of various means of overhearing when one party consents. "We see no distinction between * * * [permitting an outsider to put his ear to the handset] and permitting an outsider to use an extension telephone for the same purpose." 355 U.S. at 110–111, 78 S.Ct. at 163. In any event, our disposition of this appeal makes it unnecessary for us to resolve these contentions.

the statutory objections to the admissibility of the recorded statements of Jones. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Goldstein v. United States, 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312 (1942); Massiah v. United States, *supra,* 377 U.S. at 207, 62 S.Ct. 1000, 86 L.Ed. 1312. Independent of the issue of standing, however, we should note that only recently in Davis v. United States, 120 U.S. App.D.C. 224, 345 F.2d 441, Dec. 8, 1964, cert. pending, the admissibility of a tape recording consented to by one of the parties was held to be controlled by Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), and Rathbun v. United States, *supra.*[3]

*Impeachment of Appellant's "character" witness:* Appellant put in issue his reputation for honesty and truthfulness by tendering witnesses as to his reputation in this respect. One, a retired judge, was asked on cross examination by detailed questions[4] whether he had heard

that in 1950 Appellant had given false testimony to a Congressional Committee investigating "wiretapping" episodes at Washington hotels. An earlier bench conference had developed the fact that such charges had been made against Appellant but that a Police Trial Board had acquitted him by a two-to-one vote.

The District Judge after first indicating he would allow testimony as to the outcome of the charges against Appellant then ruled that under Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L. Ed. 168 (1948), he could not allow such testimony because the substantive facts were not in issue—only whether the Appellant's "character" witnesses had heard of any such charges. A Police Official testifying for Appellant had earlier said he did not recall hearing of the charges, although the evidence was that he had been a colleague and close acquaintance of Appellant in 1952. The retired judge said he had heard of the 1952 charges but that these did not affect his testimony

3. A point raised for the first time on appeal is that the conversations overheard were not in furtherance of the conspiracy but being subsequent to Barber's May 3 Grand Jury appearance, they came, if conspiratorial, after the alleged conspiracy had become an accomplished success or had failed. The indictment charged a conspiracy which continued "until on or about May 8, 1962." Appellant stipulated with the Government that the Grand Jury continued its investigation of the conspiracy through the month of May. No one could know on May 3, on May 4 or on May 8 (the dates of the recordings) whether or when Barber would be called back before that jury; the recorded conversations reflect a continuing concern for the objectives of the conspiracy and the jury obstruction charged.

4. "Q Your Honor, may I ask you, please, to answer yes or no to the following question?—

Have you heard the report that on the 28th day of August of 1950 this defendant Shimon, having taken an oath before the Special Subcommittee of the District of Columbia Senate Committee that he would testify truthfully, did willfully and knowingly testify falsely before that committee that during the period when he

was engaged in intercepting telephone communications at the Occidental Hotel he did not know the identity of the person whose telephone communications he was intercepting? Have you heard that report, Judge Cayton?

&ast; &ast; &ast; &ast; &ast;

Q Now, Your Honor, may I ask you further, have you heard that on the 30th day of August of 1950 the defendant, Joseph W. Shimon, then a police lieutenant, before that same Special Subcommittee of the Committee of the District of Columbia of the United States Senate, then investigating the subject of wiretapping, that the same defendant did willfully and knowingly testify falsely before the subcommittee that he learned who the persons at the Mayflower Hotel were whose telephone communications he was intercepting at the Mayflower Hotel, after he commenced to intercept certain telephone communications there, whereas in fact the said Lieutenant Joseph W. Shimon then and there well knew that prior to the time he commenced to intercept those telephone communications he knew that the persons at the Mayflower Hotel whose telephone communications he was about to intercept were representatives of Howard Hughes? Have you heard that report, sir?" Tr. 1616, 1617–1618.

and then sought to explain his answer. We are satisfied from the record that the witness sought to explain that he had also heard Appellant was found not guilty by the Trial Board. Government objections sustained by the court prevented any explanation, as we have noted.

We are faced at the outset with the rule that a Trial Judge is vested with very wide discretion as to the scope of testimony of witnesses on reputation and especially wide discretion to prevent having the trial of an accused be diverted into a collateral inquiry by the efforts at impeachment and subsequent efforts to rehabilitate the reputation witness.

Under the *Michelson* holding, *supra,* when an accused opens the subject of his reputation by calling reputation witnesses they are restricted to what they have *heard* as to his good repute; they may not testify as to specific facts known but only general repute as an exception to the hearsay rule. The term "character" witness is, of course, a misnomer, for it is reputation not character which is then the issue. It is not what the speaker knows as to the Defendant's personal habits, character, family or business integrity but what he has heard about his reputation in this regard. It is not the substance but "the shadow his daily life has cast in his neighborhood" which is the subject of inquiry. 335 U.S. at 477, 69 S.Ct. 213. The wisdom of this rule of law and the paradoxes it embraces are not open to us; the Supreme Court has approved these standards based perhaps not upon ideal considerations but upon difficult choices. Thus a Defendant may try, whether or not he takes the stand, to cast doubt [5] on the probability of guilt by showing that some in his community believe him to be truthful and honest. But a Defendant pays a price for attempting to show his good repute by opening "the entire subject which the law has kept closed for his benefit and

[thus making] * * * himself vulnerable where the law otherwise shields him." *Michelson, supra,* 335 U.S. at 479, 69 S.Ct. at 220. The prosecution may reply with other hearsay which may embrace rumors—true or false—that the Defendant's reputation for the trait put in issue is not good. As we have noted it is not the truth about the man in a factual sense but his "community image" which has come into issue. The prosecution may explore the scope and basis of the witness' knowledge of the Defendant's reputation by asking if he has heard various reports about the Defendant provided the questions have a basis in the sense that arrests or accusations, for example, which neighbors normally discuss about one another, have been rumored and discussed. The danger lurking in this impeachment process is that in order to frame an intelligible question, the examiner's query often gives details of *specific misconduct* affecting general reputation which would not otherwise be admissible. See 3 WIGMORE, EVIDENCE § 988 (3d ed. 1940).

Justice Jackson [6] commented on that:

> Both propriety and abuse of hearsay reputation testimony, on both sides, depend on numerous and subtle considerations, difficult to detect or appraise from a cold record, and therefore rarely and only on clear showing of prejudicial abuse of discretion will Courts of Appeals disturb rulings of trial courts on this subject. (Footnote omitted.)

The wide discretion vested in a trial judge carries with it a very heavy and difficult responsibility to control the use of both devices—the parade of partisans and their impeachment by reference to other rumored acts and events. He must be alert to prevent questions conveying to the jury by innuendo prejudicial matter in which the Defendant himself is the

5. See Edgington v. United States, 164 U.S. 361, 17 S.Ct. 72, 41 L.Ed. 467 (1896), ("character" evidence alone may raise reasonable doubt of guilt).

6. Michelson v. United States, *supra,* 335 U.S. at 480, 69 S.Ct. at 221.

real target, *cf.* Luck v. United States, 121 U.S.App.D.C. ——, 348 F.2d 763, May 21, 1965; the target of the impeachment of a reputation witness is the credibility of the witness, not the prior conduct of the Defendant.

In this case the trust of the impeachment examination not only embraced but stressed conduct of the Defendant relating to possible falsehoods before a Congressional Committee—a grave matter for a police officer—and conduct involving wiretapping of hotel rooms, essentially the same offense from which the instant indictment grew. The *Michelson* case, which the Government urged upon the District Judge, noted that the impeachment question there revolved around "an offense not closely similar to the one on trial. * * *" The prejudicial impact of impeachment questions involving the same kind of offense might in some cases so outweigh the legitimate probative value of impeachment that they should not be allowed or if allowed should be limited in scope so as not to strike the accused under the cloak of impeachment of the witness.

To accomplish the legitimate objectives of impeachment in this case it was a simple matter to limit the questions to the issue tendered, *i. e.*, Appellant's reputation for veracity, without making reference to the specific wiretapping episodes. The wiretapping activities attributed to Appellant in the questions did not go to Appellant's reputation for truth and honesty but rather seemed to go out of their way to describe prior wiretapping similar to the conduct underlying the indictment in the case then on trial and thus brought to the jury indirectly and by innuendo matter which could not have been introduced directly. The questions unnecessarily blended two factors—lying and wiretapping—which were readily severable; .the proper form of question was simply to ask the witness whether he had heard that Appellant had been charged before a Police Board with giving false testimony to a Committee of Congress. This is not a case where the impeachment question could not be framed so as to avoid undue prejudice.

The prejudice in the peculiar circumstances of this case might have been neutralized if not erased had the witness been permitted to say what he had heard as to the outcome of the charges. Any arrest or charge, true or false, can impair one's reputation even though unfairly, and a subsequent acquittal does not always erase the smudge; but it is important that if the charge is dismissed or an acquittal follows that the scales be balanced by letting a reputation witness say whether he has heard the outcome and what it was he heard. Here a retired judge after testifying to good repute was required to say that he had heard Appellant had been charged by his superiors with serious misconduct but was denied the opportunity to say that he had also heard the charges were dismissed.

We are reluctant that a lengthy trial should go for naught but other considerations must control; the prosecution may have brought this about by overpersuading the Trial Judge on a delicate, close and complex subject in circumstances where a decision had to be swiftly made. In retrospect it is clear that to have allowed the question as to what the witness had heard concerning the results of the Police Board trial would in no sense have brought on the problem of trial-within-trial of collateral issues. Cf. United States v. Boyer, 80 U.S.App.D.C. 202, 150 F.2d 595, 166 A.L.R. 209 (1945). The appropriate ruling would have been to advise both sides that the questions as to the Police Board charges would be permitted only if the witness would also be permitted to state what he had heard as to the outcome of these charges: this was indispensable to fairness. This is not a situation where some countervailing consideration dictates that only one side of the coin be revealed.

Since there must be a new trial, it is assumed that should the occasion arise to deal with this issue the form of the impeachment question will be more appropriately restricted and the witness will

be allowed to state what he heard, if anything, as to the outcome of the charges.

Viewing this episode against the whole record we are unable to conclude that the error did not unduly prejudice the Appellant.

Reversed and remanded for a new trial.